# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Indian Harbor Insurance
Company,

                Plaintiff,       Case No. 1:20-cv-1207-MLB

v.

Kevin Willard,

                Defendant.

_____/

## **OPINION & ORDER**

This insurance coverage dispute arises out of an automobile collision involving Defendant Kevin Willard (a Lyft driver), Trevor Gabbidon (his passenger), and Gregory Adams (another motorist). Plaintiff Indian Harbor Insurance Company (Lyft's insurer) brought this declaratory action to limit its liability to Defendant under uninsured/underinsured motorist provisions of its agreement with Lyft. Plaintiff and Defendant now cross-move for summary judgment. (Dkts. 43; 44.) The Court denies both.

## I.    Background

On May 23, 2019, Defendant Willard got a ride on Lyft.  (Dkts. 43-2 ¶ 1; 45 ¶¶ 1–2; 50 ¶¶ 1–2.)  Mr. Gabbidon was his driver.  (*Id.*)  While Mr. Gabbidon was making a turn, he collided with a vehicle driven by Mr. Adams.  (Dkts. 43-2 ¶ 1; 45 ¶ 1; 50 ¶ 1.) Defendant was injured in the accident and blamed both Mr. Gabbidon and Mr. Adams.  (Dkts. 45 ¶¶ 4–5; 50 ¶¶ 4–5.)

Prior to the accident Plaintiff issued a Commercial Lines Insurance Policy to Lyft as the named insurer ("Policy").  The Policy was effective on the day of the accident.  (Dkts. 43-2 ¶ 4; 45 ¶ 9; 50 ¶ 9.)  It provided commercial auto liability coverage with a $1 million liability cap per incident and UM coverage according to endorsements.  (Dkts. 45 ¶ 10; 50 ¶ 10.)   Plaintiff initially issued the Policy with a Georgia Uninsured Motorists—Added On To At-Fault Liability Limits Endorsement that set a liability limit of $1 million per accident ("Added On UM Endorsement").  (Dkts. 45 ¶ 11; 50 ¶ 11.)   Effective March 21, 2019, the Policy was amended to delete the Added On UM Endorsement and replace it with Endorsements Nos. 44 and 45 known as the "Notification to Others of Cancellation, Non-Renewal or Reduction In Limits and the Georgia

Uninsured Motorists Coverage—Reduced By At-Fault Liability Limits"

("Endorsement").[1]  (Dkts. 43-2 ¶ 5; 45 ¶ 12; 50 ¶ 12.)[2]  The Endorsement,

which was effective at the time of the accident, set the limits of insurance

as $1 million for each accident.   (Dkts. 45 ¶ 13; 50 ¶ 13.)   The

Endorsement provides:

### D. Limit Of Insurance

> . . .
> 2. No one will be entitled to receive duplicate payments
> for the same elements of "loss" under this Coverage
> Form, any Liability Coverage Form or any Medical
> Payments Coverage endorsement attached to this
> Coverage Part.

---

[1] Plaintiff states, "[e]ffective May 1, 2019, the Policy was amended[,]" but
Defendant and the endorsements attached to Plaintiff's complaint state
the amendatory endorsements were effective March 21, 2019. (Dkts. 43-2
¶ 5; 45 ¶ 12; 1-6 at 1.)

[2] Defendant responded to Plaintiff's statement of material facts, objecting
to/denying facts 12 and 15.  (Dkt. 50 ¶¶ 12, 15.)  Fact 12 states the Policy
was amended to replace the Added On UM Endorsement with the
Endorsement.  (Dkt. 45 ¶ 12.)  Fact 15 states Defendant constitutes an
insured for purposes of the Policy's UM coverage provided by the
Endorsement.  (*Id.* ¶ 15.)  Defendant denied these facts to the extent they
claim the Endorsement is legally relegated to reduced-by UM coverage.
(Dkt. 50 ¶¶ 12, 15.)  Defendant, however, later filed a partial withdrawal
of argument and response to Plaintiff's statement of material facts,
withdrawing his response to Plaintiff's fact 12.  (Dkt. 54 at 2.)  Defendant
stated that the purpose of the document was to make clear he is no longer
advancing the argument that the UM coverage is add-on due to the
absence of a valid rejection form.  (*Id.*)  The Court thus treats all of
Plaintiff's facts as admitted.

We will not make a duplicate payment under this coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.
. . .
3. The Limit of insurance under this coverage shall be reduced by all sums paid or payable by or for anyone who is legally responsible, including all sums paid under this Coverage Form's Covered Autos Liability Coverage.

(Dkt. 1-6 at 3.)

At the time of the accident Mr. Gabbidon qualified as an insured under the Policy. (Dkts. 45 ¶ 14; 50 ¶ 14.) Because he had secured a ride through Lyft's ride-sharing network, Defendant also qualified as an insured for purposes of the Policy's UM coverage. (Dkts. 45 ¶ 15; 50 ¶ 15.) In October 2019, Plaintiff paid Defendant a confidential settlement on behalf of Lyft, Mr. Gabbidon, and others from the Covered Autos Liability Coverage provided under the Policy.[3] (Dkts. 43-2 ¶ 8; 45 ¶ 6; 50 ¶ 6.) In November 2019, Defendant sued Mr. Adams in the State Court of Cobb

---

[3] The parties seem to dispute the exact date. Plaintiff states Defendant was paid a confidential settlement on October 17, 2019, but Defendant and the parties' joint stipulation of facts contend Defendant was paid a settlement on or about October 16, 2019. (Dkts. 45 ¶ 6; 43-2 ¶ 8; 39 ¶ 6.) This dispute is irrelevant. The parties disagree as to who the settlement was on behalf of, but the parties' joint stipulation of facts states the settlement was on behalf of Mr. Gabbidon, Lyft, and others from the Covered Autos Liability Coverage provided under the Policy. (Dkt. 39 ¶ 6.)

County, Georgia for personal injuries and damages.[4] (Dkts. 43-2 ¶ 9; 45 ¶ 7; 50 ¶ 7.) Defendant also served a copy of the summons and complaint on Plaintiff, claiming he is entitled to uninsured/underinsured motorist coverage under the Policy as a result of the alleged negligence of Mr. Adams. (Dkts. 43-2 ¶ 9; 45 ¶ 7; 50 ¶ 7.) Mr. Adams' automobile insurer, USAA, paid Defendant $25,000 in liability limits under the USAA policy. (Dkts. 43-2 ¶ 10; 45 ¶ 8; 50 ¶ 8.)

## A.    Procedural History

Plaintiff filed this federal action in March 2020, seeking a declaration that (1) the limits of the uninsured motorist coverage provided in the Policy are offset by the money it previously paid Defendant and that USAA paid Defendant and (2) Defendant is not entitled to receive duplicate payments for the same elements of his loss, or his alleged injuries and damages from the accident, under the Covered Autos Liability Coverage provided in the Policy or by the USAA liability

---

[4] The parties dispute the exact date the underlying suit began. Plaintiff states Defendant filed suit on "December 30, 3019" and Defendant states he filed suit on "November 20, 2019." (Dkts. 45 ¶ 7; 43-2 ¶ 9.) The underlying action's complaint, however, states it was submitted November 26, 2019. (Dkt. 1-7 at 4.) Defendant contends he filed suit against Adams and Lyft, but the underlying action's complaint only lists Adams as a defendant. (Dkt. 1-7 ¶ 2.)

policy issued to Mr. Adams.  (Dkt. 1 at 9.)  On February 19, 2021, the parties filed cross-motions for summary judgment.  (Dkts. 43; 44.)

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute.  *Matsushita Elec.*

6

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

Throughout its analysis, the Court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc)).  "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a

motion. "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Georgia State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal citation omitted). The Court applies the standard outlined above to each party's motion.

## III.  Discussion

### A.    Amount of UM Coverage

The sole issue before the Court is the amount of uninsured/underinsured motorist coverage provided by the Policy to Defendant for injuries and damages arising from his claim against Gregory Adams. (Dkt. 12 at 4.) Defendant does not contest that Plaintiff may reduce the available uninsured coverage by the $25,000 paid by Mr. Adams' insurance coverage. (Dkt. 43-1 at 9 n.1.) The Court will thus solely address whether Plaintiff can reduce the available underinsured motorist coverage by the sum it paid Defendant in the settlement of his claim against the Lyft driver.

"[I]nsurance in Georgia is a matter of contract, and this Court has long held that such contract disputes are well suited for adjudication by summary judgment because construction of a contract is ordinarily a matter of law for the court." *Goldeagle Ventures, LLC v. Covington Specialty Ins. Co.*, 825 S.E.2d 881, 884 (Ga. Ct. App. 2019) (quoting *S. Tr. Ins. Co. v. Cravey*, 814 S.E.2d 802, 803 (Ga. Ct. App. 2018)). The central rule of contract interpretation is to find the parties' intent. O.C.G.A. § 13-2-3 ("The cardinal rule of construction is to ascertain the intention of the parties."). To do so, the Court starts with the contract's plain meaning. *See Goldeneagle Ventures*, 825 S.E.2d at 884. If unambiguous, the Court applies that meaning. *See id.* But if the contract is ambiguous (that is, its provisions are susceptible to more than one meaning) the Court uses the rules of contract construction to resolve the ambiguity. *See id.*; *First Acceptance Ins. Co. of Ga., Inc. v. Hughes*, 826 S.E.2d 71, 75 (Ga. 2019) ("Ambiguity is defined as duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations."). And if the contract remains

ambiguous after application of those rules, the Court can examine extrinsic evidence. *See Grange Mut. Cas. Co. v. Snipes*, 680 S.E.2d 438, 441 (Ga. Ct. App. 2009).

Plaintiff asserts, and the Court agrees, the plain language of the Policy's Endorsement unambiguously states the UM limit is reduced by all sums paid or payable by or for anyone who is legally responsible. Plaintiff says this means the $1 million limit is reduced by sums paid to Defendant under the Policy's liability coverage. (Dkt. 44 at 8.) Defendants says that, to the extent the Endorsement is read this way, it must be declared void and unenforceable under Georgia law. (Dkt. 43-1 at 7.)

Georgia law requires all automobile liability policies to include uninsured motorist coverage. O.C.G.A. § 33-7-11 states, in part, that the amount of available coverages shall be in addition to the amount payable under liability coverages or, to the extent the insured makes a selection in writing, shall be the difference between the available liability coverages and limits of the uninsured motorists coverages. O.C.G.A. § 33-7-11(b)(1)(D)(ii). State law thus permits two types of UM coverage: (1) an excess policy which provides for UM insurance in excess of any

available liability insurance (referred to as "add-on coverage") and (2) a difference-in-limits policy which provides for UM coverage only for the amount of the difference between the available liability insurance and the limits of the insured's UM coverage (referred to as "reduced-by coverage"). *Donovan v. State Farm Mut. Auto. Ins. Co.*, 765 S.E.2d 755, 757 (Ga. Ct. App. 2015) (internal citations omitted).  As the Endorsement provides for reduced-by coverage, it seems compliant with Georgia law.

But, at the time of the accident, Lyft was a "transportation network company" and Mr. Gabbidon was a "transportation network company driver"—both as defined by O.C.G.A. § 33-1-24.  (Dkts. 43-2 ¶¶ 2–3; 45 ¶¶ 2–3; 50 ¶¶ 2–3.)   That section specifically addresses insurance requirements for such companies, including uninsured motorist coverage.  It states:

> A transportation network company shall maintain or cause to be maintained a primary motor vehicle insurance policy that: . . . provides a minimum of $1 million for death, personal injury, and property damage per occurrence ***and*** provides uninsured and underinsured motorist coverage of at least $1 million per incident.

O.C.G.A. § 33-1-24(b)(3) (emphasis added).  Defendant reads this statute to preclude transportation network companies from offering less than $1 million in UM coverage and says, to the extent a reduced-by endorsement

causes coverage to fall below $1 million, it is unenforceable.  (Dkts. 43-1 at 7; 49 at 2.)   Because the Endorsement at issue here does that, Defendant says it is unenforceable.  *See Massey v. Allstate Ins. Co.*, 800 S.E.2d 629, 633 ("[P]rovisions in insurance policies that conflict with the plain terms of Georgia's insurance statutes are illegal and of no effect."). Plaintiff, on the other hand, contends reduced-by UM coverage is an authorized type of UM coverage under O.C.G.A. § 33-7-11, and the plain language of O.C.G.A. § 33-1-24 does not prohibit it.  (Dkt. 44 at 7.)

The Court agrees with Plaintiff.  "When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 751 S.E.2d 337, 341 (Ga. 2013) (quotations omitted).  "[T]he cardinal rule is to glean the intent of the legislature in the light of the legislative intent as found in the statute as a whole." *Abrohams v. Atl. Mut. Ins. Agency*, 638 S.E.2d 330, 332 (Ga. Ct. App. 2006).  In doing so, the court "follow[s] the literal language of the statute unless it produces contradiction, absurdity, or such an inconvenience as to ensure that the legislature meant something else. Absent clear evidence that a contrary meaning was intended by the legislature, we assign words in a statute their ordinary, logical, and

common meanings." *Turner v. Ga. River Network*, 773 S.E.2d 706, 708 (Ga. 2015).

In considering the meaning of a statutory provision, courts also consider the legal context, including other provisions of the same statute, the structure and history of the statute, and other law that forms the legal background of the statutory provision in question. *See Federal Deposit Ins. Corp. v. Loudermilk*, 761 S.E.2d 332, 340 (Ga. 2014) (quoting *May v. State*, 761 S.E.2d 38, 41 (Ga. 2014)); *Gray v. State*, 850 S.E.2d 36, 38 (Ga. 2020) ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law."). With these broad canons in mind, the Court notes "[u]ninsured motorist statutes are remedial in nature and must be broadly construed to accomplish the legislative purpose." *Abrohams*, 638 S.E.2d at 332.

Defendant contends that, under the plain language of O.C.G.A. § 33-1-24(b)(3) and § 33-7-11, Lyft's insurance coverage must provide $1,000,000 in personal injury coverage *and* $1,000,000 in uninsured motorist coverage. (Dkt. 43-1 at 8.) He says Plaintiff's liability coverage

for its driver's negligence does not relieve it from its statutory obligation to provide UM coverage for a different tortfeasor under the same policy.[5] (*Id.* at 9.) He contends Section 33-1-24 does not authorize reduced-by UM coverage, and the default rule, which the Court should apply, is that UM

---

[5] Plaintiff, relying on *Sanborn v. Farley*, 385 S.E.2d 6 (Ga. Ct. App. 1989), claims the Policy reduces the limits of UM coverage based on all available liability coverages to the insured arising from a single accident (not on a per-tortfeasor basis). (Dkts. 44 at 11; 51 at 4.) In *Sanborn*, the trial court held that "the proper way to determine the uninsured motorist exposure was to subtract the total liability coverage from the total uninsured motorist coverage." *Id.* at 7. The Georgia Court of Appeals affirmed, noting the method of offsetting the total uninsured motorist coverage by the liability insurance coverage actually available was approved by the Georgia Supreme Court. *Id.* (citing *Georgia Farm Bureau Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 336 S.E.2d 237, 237 (Ga. 1985)). Defendant contends *Sanborn* is inapplicable because it concerns the previous version of Section 33-7-11, does not interpret Section 33-1-24(b)(3), and was issued over 30 years ago—when app-based rideshare companies did not exist. (Dkt. 49 at 11.) He argues because Section 33-7-11 was never intended to apply to a transportation network company, the decision has little bearing on this case. (*Id.*) The General Assembly, however, is presumed to know the legal landscape when issuing new legislation. In the more than 25 years since *Sanborn* was decided, the General Assembly has not amended Section 33-7-11 in any way to reflect a disapproval of the decision. *See Gray*, 850 S.E.2d at 39 ("All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it."). The General Assembly knew of Section 33-7-11 and the *Sanborn* opinion when it issued Section 33-1-24, so the Court finds Defendant's arguments unavailing. The method for determining reduced-by coverage is thus subtracting the *total* liability coverage actually available from the *total* uninsured motorist coverage.

coverage is add-on.  (Dkts. 49 at 12; 56 at 4.)   Nothing in the language of Section 33-1-24, however, prohibits the reduced-by type of UM coverage and mandates the add-on type of coverage.  (Dkt. 44 at 14, 18.)  Rather, the statute simply refers to the minimum limits of UM coverage.  (*Id.* at 19.)   Defendant even admits Section 33-1-24(b)(3) does not specify whether the UM coverage is reduced-by or add-on.  (Dkt. 49 at 12.) Plaintiff argues, and the Court agrees, to conclude the $1 million in UM coverage discussed in Section 33-1-24 can only be provided through the add-on type of UM coverage would, contrary to rules of statutory construction, require the Court to read language into the statute that is not present.[6]  *See State v. Fielden*, 629 S.E.2d 252, 257 (Ga. Ct. App. 2006) ("[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes."); *Gray*, 850 S.E.2d at 40 (rejecting the

---

[6] Defendant also argues Section 33-7-11 is not intended to apply to a transportation network company and because Section 33-1-24 imposes a mandatory duty to maintain "uninsured and underinsured motorist coverage" of $1 million, the statute is distinguishable from Section 33-7-11 which does not require an owner of a motor vehicle to purchase UM coverage.  But, again, the Georgia General Assembly never made such prohibitions.   The Court also takes issue with this argument since Defendant contends the Court should conclude Section 33-7-11 does not apply to a rideshare transportation network, yet he argues the Court should apply the default rule for UM coverage to Section 33-1-24. (Dkt. 49 at 12.)  The "default rule" is created by Section 33-7-11.

argument that the legislature implicitly rejected the common law rule because it did not write the rule into the statute and instead "presum[ing] the opposite—that the legislature knew about the common-law rule, wanted to keep the rule, and understood that it would be unnecessary to write the rule into the statute when courts have incorporated the common-law rule into the statute for decades"); *Glass v. Faircloth*, 840 S.E.2d 724, 729 (Ga. Ct. App. 2020) (refusing to read a limitation into a statute that was not supported by the plain statutory language). The Court thus does not read any prohibition into Section 33-1-24.

Defendant also contends that, in the absence of language specifically authorizing reduced-by coverage or references to Section 33-7-11, the Court should apply the default rule regarding UM coverage which is that UM coverage is add-on. (Dkt. 49 at 12.) But "[a]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are, therefore, to be construed in connection and in harmony with the existing law." *Gray*, 850 S.E.2d at 38. The Court thus presumes the Georgia General Assembly knew about Section 33-7-11, which was enacted 8 years before Section 33-1-24, and construes Sections 33-1-24 and 33-7-11 in harmony.

16

The Court also "presume[s] that the General Assembly meant what it said and said what it meant." *Deal*, 751 S.E.2d at 341. The General Assembly knew how to, and did not, prohibit reduced-by UM coverage or mandate add-on UM coverage for companies like Lyft. The Court thus finds Section 33-1-24 allows reduced-by coverage and the Policy and Section 33-7-11 do not conflict with that.[7]

---

[7] Defendant also contends the Endorsement conflicts with the purpose and intent of Section 33-1-24. (Dkt. 49 at 8–9.) To be clear, the Court believes whether Section 33-1-24 allows reduced-by UM coverage is a matter of simple statutory interpretation. That determination can, and must, be made by first examining the statutory text. *Howe v. Smith*, 452 U.S. 473, 480 (1981). The Court, however, will address Defendant's arguments as to purpose and the remedial nature of UM insurance to be thorough. First, Defendant argues the purpose of the $1 million liability and $1 million UM coverage is to protect an injured passenger, citing to a journal article and online article which have no relation to Georgia. (Dkt. 49 at 9 (citing Alexander B. Traum, *Sharing Risk in the Sharing Economy: Insurance Regulation in the Age of Uber*, 14 Cardozo Pub. L. Policy & Ethics J. 511, 530 (2016)); NAIC, *Transportation Network Company Insurance Principles for Legislators and Regulators* (March 31, 2015),
https://olis.leg.state.or.us/liz/2015r1/Downloads/CommitteeMeetingDocument/60931).) Although Defendant contends Georgia "clearly" relied on the National Association of Insurance Commissioners and adopted a statutory scheme which aims to protect passengers who are injured during a rideshare trip, he provides no citation or reference to any legislative history that this presumed purpose was the purpose behind Section 33-1-24 or otherwise guided the General Assembly. (*Id.*) Second, Defendant contends because Section 33-1-24 is remedial, it should be construed broadly to provide the greatest amount of insurance coverage

Defendant, citing *Hudson v. Whited*, 552 S.E.2d 447 (Ga. Ct. App. 2001), and similar cases, argues the Endorsement is void and unenforceable because it tries to reduce the total amount of liability and uninsured coverage that the Georgia General Assembly has required transportation network companies to carry.[8]  (Dkt. 43-1 at 9–10 (also citing *Hudson* & *State Farm Mut. Auto. Ins. Co. v. Johnson*, 190 S.E.2d 113 (Ga. Ct. App. 1972) ("*Johnson*").)  In *Hudson*, the plaintiff received workers' compensation benefits after being injured in an automobile collision.  552 S.E.2d at 448.  The plaintiff was also entitled to UM benefits, but the policy said such payments were to be reduced by any payments made under workers' compensation law.  *Id.* at 448–49.  That

---

possible for him.  (Dkt. 56 at 5.)  As explained though, there is no prohibition on the UM coverage being reduced-by.  The Court thus finds these arguments unavailing.

[8] Plaintiff contends these cases are distinguishable because they address whether UM coverage is subject to reduction based upon payment of workers' compensation benefits or similar benefits.  (Dkt. 51 at 5–6.)  It contends the *Hudson* and *Johnson* courts reasoned that the applicable statute did not authorize reduction of UM coverage based on recovery of workers' compensation benefits and medical payments coverage, respectively.  (*Id.* at 6.)  These courts, however, did not base their opinions on the idea that the statute did not authorize such reductions. The opinions were based on the finding that such reductions are contrary to the UM statute if they thwart the insured's ability to recover all sums the insured is legally entitled to recover.

18

offset exceeded the policy limits, meaning the insured would receive no additional money under the UM policy. *Id.* at 449. The Court of Appeals explained that Georgia's UM statute "requires insurers to offer coverage which undertakes to pay the insured all sums which said insured shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle." *Id.* (internal quotation omitted). Because enforcing the offset provision would thwart that purpose, the Court of Appeals declared the offset provision unenforceable. *Id.*

In reaching that conclusion, the Court of Appeals distinguished *Johnson v. State Farm Mutual Automobile Insurance Co.,* 455 S.E.2d 91 (Ga. Ct. App. 1995) ("*Johnson II*"). In that case, an insured tried to avoid a provision of a UM policy that offset UM liability by previously paid medical fees. *Id.* at 92. The insurance policy limits, however, far exceeded the insured's damages, meaning the offset for medical expenses already paid would not prevent the insured from receiving "all sums she was legally entitled to, even with the reduction." *Hudson*, 552 S.E.2d at 453 (citing *Johnson II,* 455 S.E.2d at 93) (internal quotations omitted). The Court of Appeals explained an offset clause would be unenforceable when actual damages are ***greater*** than the policy limits because, in that

situation, the offset would preclude the insured from recovering the sums to which he was entitled. *Id.* at 450; *Johnson II*, 455 S.E.2d at 94.

Based on the record, the Court cannot determine how this rule applies here. Defendant's actual losses appear to be in dispute: maybe they exceed the UM limits, maybe they do not. There is thus a genuine dispute on whether the Endorsement would thwart Defendant's ability to recover all sums he is legally entitled to. The Court thus denies both Plaintiff's and Defendant's motions for summary judgment.

### B.    Premature

Because there is a genuine dispute of material fact as to whether the Endorsement prevents Defendant from recovering all sums he is legally entitled to, the Court need not, and declines to, make a ruling on Defendant's contention Plaintiff is not entitled to summary judgment because it is premature to apply the Endorsement. (Dkt. 49 at 14.) The Endorsement provides:

> The Limit of Insurance under this coverage shall be reduced by all sums paid or payable by or for anyone who is *legally responsible*, including all sums paid under this Coverage Form's Covered Autos Liability Coverage.

(Dkt. 1-6 at 3 (emphasis added).) Defendant's argument seems to impose a requirement of a finding of liability that is not part of the Policy. The

parties ignore the phrase "including all sums paid under this Coverage Form's Covered Autos Liability Coverage." (*Id.*)  Because the Court must read the Policy together, the Policy seems to define legally responsible as "including all sums paid under this Coverage Form's Covered Autos Liability Coverage." (*Id.*)  *See NW Parkway, LLC v. Lemser*, 709 S.E.2d 858, 861 (Ga. Ct. App. 2011) ("[I]t is a cardinal rule of contract construction that a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms.").  The language of the Policy suggests all sums paid under this Coverage Form's Covered Autos Liability Coverage is defined as payment for someone legally responsible. But the Court makes no such finding because neither party put this argument to the Court and there is no briefing on it.

## IV.  Conclusion

The Court **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 44) and **DENIES** Defendant's Motion for Summary Judgment (Dkt. 43).

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator

must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before September 7, 2021, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before September 21, 2021. The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation led to a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of stay.

**SO ORDERED** this 23rd day of August, 2021.


MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE